`IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                          CRIMINAL NO. 3:24CR26-CWR-ASH

PEDRO MUNOZ BENITO

## MOTION TO DISMISS

COMES NOW the defendant, Pedro Munoz-Benito, and respectfully moves this court to dismiss the Indictment, which charges him with possession of a firearm by a person "who, being an alien – is illegally or unlawfully in the United States," in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(8). Mr. Munoz-Benito contends that this charge against him should be dismissed because § 922(g)(5) is unconstitutional in light of the recent ruling by the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and the Fifth Circuit's guidance in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). In support of this Motion, Mr. Munoz-Benito presents the following argument:

**I. Legal background.**

Mr. Munoz-Benito has been charged with violating 18 U.S.C. § 922(g)(5)(A). Section 922(g)(5)(A) provides:

> It shall be unlawful for any person . . . who, being an alien – (A) is illegally or unlawfully in the United States . . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(5)(A).

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST., amend. II. The Supreme Court has held that the Second Amendment

"guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

The Supreme Court's recent decision in *Bruen* set out "the standard for applying the Second Amendment":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. 2111, 2129–30 (2022). In so holding, the Supreme Court rejected lower courts' use of means-end scrutiny in Second Amendment cases. *See id.* at 2125–27 & n.4 (abrogating *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012)). "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2126.

The Supreme Court noted that *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) centered on constitutional text and history. The Court, in *Heller*, declined to establish a test that identified the level of scrutiny to apply to Second Amendment cases, stating instead that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 635. The Court acknowledged that this change in the approach to Second Amendment jurisprudence would not "clarify the entire field." *Id.*

In the years since *Heller* and *McDonald,* "the Court of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 142 S.Ct. at 2125. The Supreme Court, in *Bruen,* soundly rejected this approach, holding that "[i]n keeping with *Heller,* we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

And "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28; *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

## II. Argument.

The Second Amendment's plain text covers the conduct proscribed by Section 922(g)(5)(A), and the prosecution cannot meet its burden of establishing that this application of Section 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation. Therefore, Section 922(g)(5)(A) is unconstitutional as applied to Mr. Munoz-Benito.

### A. The Second Amendment's plain text covers possession.

Applying *Bruen*'s standard, the Second Amendment's plain text covers the "possess[ion]" of a firearm that the statute criminalizes. 18 U.S.C. § 922(g)(5)(A). The term "'[k]eep arms' was simply a common way of referring to possessing arms." *Heller*, 554 U.S. at 583.

### B. Mr. Benito is one of "the people" protected by the Second Amendment.

The Supreme Court has determined that the phrase, "the people, " used in the Preamble and in the First, Second, Fourth, Ninth, and Tenth Amendments of the United States Constitution, is a term of art. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). In *Verdugo-Urquidez*, the Supreme Court defined "the people" as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265. The Supreme Court, in *Heller*, also approved this definition in the context of the Second Amendment. 554 U.S. at 580. This Court has also been consistent in interpreting the term "the people" in this way. *See Rahimi*, 61 F.4th at 451;[1] *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 622 (5th Cir. 2006) (overruling risk on other grounds) (permitting an alien who was in the country on an expired visitor's visa to bring a *Bivens* claim against an officer for excessive use of force) The importance of the *Verdugo-Urquidez* definition is this: "the people" entitled to

---

[1] The Fifth Circuit has abrogated its pre-*Bruen* Second Amendment cases on the basis that its prior decisions were based on an intermediate scrutiny analysis, but its interpretation of the term "the people" was re-affirmed in *Rahimi*. *See United States v. Emerson*, 270 F.3d 203, 227-28 (5th Cir. 2001) (abrogation recognized by *Rahimi*) (holding that the term "the people" has a consistent definition throughout the Constitution, including the First, Second, and Fourth Amendments). Accordingly, the Fifth Circuit has been consistent in its interpretation of the term "the people," even in the Second Amendment context.

constitutional protections extends to aliens if they have "sufficient connection" with the United States.[2]

Moreover, the 5th Circuit has recently re-affirmed that the proper definition of "the people" in the context of the Second Amendment is the definition set forth in *Verdugo-Urquidez*. In its two landmark post-*Bruen* decisions, the court interpreted the term "the people" through the lens of *Verdugo-Urquidez*. See *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023), petition for certiorari filed, No. 23-376 (Oct. 10, 2023); *Rahimi*, 61 F.4th at 451. These recent decisions, applied to Second Amendment challenges like Mr. Munoz-Benito's, demonstrate that *Portillo-Munoz's* analysis is no longer good law. At least one district court in this Circuit has since rejected the *Portillo-Munoz* analysis and applied the *Verdugo-Urquidez* definition of "the people" as re-affirmed in *Rahimi* and *Daniels* in a § 922(g)(5)(A) case. See *United States v. Sing-Ledezma*, Case No. EP-23-cr-823(1)-KC, 2023 WL 8587869, *6 (W.D. Tex. Dec. 11, 2023) (holding that §922(g)(5)(A) is facially unconstitutional).

Mr. Munoz-Benito is one of "the people" under the Second Amendment's plain text because he is part of the political community. Mr. Munoz-Benito, who was born in Mexico, has spent the last three years of his life here in the United States in the state of Mississippi. His cousin, uncle, four siblings, and a brother-in-law also reside in the United States. He has

---

[2] As discussed below, however, the history of immigration "policy" and law in the United States demonstrates that a historical and textual reading of the Constitution, as *Bruen* requires, would likely not support the limited definition of "the people" set forth in *Verdugo-Urquidez*. See Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1900-01 (stating that "[A]n originalist argument that 'illegal aliens' lack Fourth Amendment rights . . . cannot be made without evidence that they were treated in that fashion in the eighteenth and nineteenth centuries. My own research has turned up no evidence that would support those propositions.")

previously worked as a painter and a roofer.[3] Accordingly, Mr. Munoz-Benito is part of the political community --"the people" – protected by the Second Amendment.

C. **The Government cannot meet its burden to demonstrate that 18 U.S.C. § 922(g)(5)(A) is "consistent with the Nation's historical tradition of firearm regulation."**

Because Mr. Munoz-Benito is one of "the people" and because the Second Amendment's plain text covers Mr. Munoz-Benito's conduct – possession of a firearm – the Second Amendment "presumptively protects" that conduct. *Bruen*, 142 S. Ct. at 2129–30. The Government, then, has the burden to establish, through historical analogues, that the United States has a history of disarming people based on their immigration status. The Government cannot establish this.

At the time of the Founding, the United States had no immigration statutes. Rather, "[t]he new country needed all the settlers it could muster." Howard S. Myers, III, *America's Immigration Policy – Where We Are and How We Arrived: An Immigration Lawyer's Perspective*, 44 Mitchell Hamline L. Rev. 743, 745 (2018). This policy of liberal immigration continued into the mid-19th century to address labor shortages following the Civil War. *See* Myers at 746. And it was the states, not the federal government, that had the authority to regulate immigrants. *See id.* gleaned

The only exception was The Alien Friends Act of 1798, a statute passed as part of the unpopular and short-lived Alien and Sedition Acts. The Alien Friends Act of 1798 "authorized the President to order the removal of any alien, regardless of country of origin, that he judged 'dangerous to the peace and safety of the United States, or had 'reasonable grounds' to suspect was engaged in reason or 'secret machinations' against its government."

---

[3] This information is gleaned from page 2 of the Pretrial Services Report.

Matthew J. Lindsay, *Immigration, Sovereignty, and the Constitution of Foreignness*, 45 Conn. L. Rev. 743, 758 (2013). It expired after two years, and President Adams never deported any immigrants under the Act. *See id.* at 760, n. 83. The political impact of the Acts revealed that most Americans preferred expansive immigration policies and constitutional protections for immigrants. *See id*. at 759-63.

The Immigration Act of 1864 was the first statute that created federal guidelines for immigration. 13 Stat. 385. It was intended to increase immigration and promote economic development by allowing employers to pay for passage in exchange for an employment agreement. *See* https://immigrationhistory.org/item/immigration-act-of-1864/#:~:text=This%20law%20legalized%20labor%20recruitment,but%20it%20was%20quickly%20repealed (last visited July 3, 2023). However, the Immigration Act of 1864 essentially created an indentured servant program. *See id.* It was wildly unpopular and was repealed in 1868.

The Page Act of 1875 was the first federal statute to limit immigration. *See* Sect. 141, 18 Stat. 477, 3 March 1875). The Page Act prohibited "importing" women (primarily Chinese women) for purposes of prostitution and restricted immigration for felons. *Id.* It was followed by the Immigration Act of 1882, which levied a tax on people entering the country and prohibited immigration of any person deemed a "convict, lunatic, idiot, or person unable to take care of himself or herself without becoming a public charge." 22 Stat. 214. Several statutes discriminating against Chinese immigrants were passed between 1882 and 1892. *See* https://www.migrationpolicy.org/sites/default/files/publications/CIR-1790Timeline.pdf (last visited June 30, 2023). Immigration restrictions based on quotas, which became the modern framework for immigration law, were not passed until the 20th century. *See id.*

### III.  Conclusion

There is no history of regulating immigration in 18th and early 19th century America, much less any history regulating or restricting an immigrant's protection under the Second Amendment. Accordingly, the Government cannot meet its burden to establish a historical tradition of disarming non-citizens.

WHEREFORE, Mr. Munoz-Benito respectfully asks this Court to grant his Motion to Dismiss the Indictment.

Respectfully submitted, this the 4th day of April, 2024.

**PEDRO MUNOZ-BENITO,**
**Defendant**

BY:  /s/ *Princess Abby*
Princess Abby (MB # 106000)
Assistant Federal Public Defender
Southern District of Mississippi
200 S. Lamar St., Suite 200 North
Jackson, Mississippi 39201
Telephone: (601)948-4284
Facsimile: (601)948-5510
Email:  princess_abby@fd.org

Attorney for Defendant

### CERTIFICATE OF SERVICE

I, Princess Abby, certify that on April 4, 2024, this Motion was filed with the Clerk of the United States District Court for the Southern District of Mississippi, using the electronic case filing system, which in turn sent an electronic copy of this Motion to all attorneys of record in this case.

/s/ *Princess Abby*
Attorney for Defendant