IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

v.                                                    Criminal No. 3:24-CR-26-CWR-ASH

PEDRO MUNOZ BENITO

**RESPONSE TO DEFENDANT'S MOTION TO DISMISS [17]**

The United States of America, by and through, the Office of the United States Attorney respectfully requests that this Honorable Court enter an order denying the Defendant's Motion to Dismiss [ECF Doc. 17], which is based on an argument that Title 18, United States Code, Section 922(g)(5)(A) is unconstitutional in the wake of the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) and the Fifth Circuit's decision in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023).

**I.      Discussion**

Defendant Benito is a citizen of Mexico who was present in Mississippi unlawfully. At no time has Benito been a citizen or lawful resident of the United States. On February 26, 2024, officers with the Clinton Police Department were dispatched to multiple calls for service regarding shots being fired in a residential area of Clinton, Mississippi. The callers described hearing gunfire in the area of Kent Drive in Clinton, Mississippi.[1] Upon arriving in the area, officers made contact with residents of the 1000 block of Kent Drive who stated that shots originated from 1004 Kent

---

[1] Within the vicinity of the shooting is the Copiah Bank, Brookdale and Trace Pointe Assisted Living Facility, The Quisenberry Library, and multiple restaurants.

1

Drive. When Officers approached the home at 1004 Kent Drive, they discovered two adult males seated inside of a Toyota pickup truck parked in the driveway. Officers observed spent shell casings on the ground in the area of the vehicle. Officers made contact with the occupants of the vehicle and ordered them to step out. After stepping out of the vehicle, officers observed more spent shell casings within the cab of the vehicle along with a handgun. Benito and the other occupant were taken into custody and charged with state crimes related to the discharge of a handgun within the city limits and operating a motor vehicle under the influence. Benito was later interviewed by law enforcement and consented to an interview after being informed of his *Miranda* rights. Benito admitted to possessing the handgun and that he had discharged the handgun in the neighborhood that evening. The recovered handgun, a Stoeger-9 9mm pistol bearing serial number T6429-21V04405, was examined by ATF Special Agent Wade Bryant who determined that the handgun had traveled in interstate or foreign commerce.

A criminal complaint was executed on February 27, 2024 before United States Magistrate Judge LaKeysha Greer Isaac charging Benito with one count of unlawfully possessing a firearm while being an alien illegally or unlawfully present in the United States, in violation of 18 U.S.C. § 922(g)(5). The matter was then presented to the grand jury which returned a single count indictment against Benito for unlawfully possessing a firearm while being an alien illegally or unlawfully present in the United States, in violation of 18 U.S.C. § 922(g)(5).

### a. Binding Fifth Circuit Precedent Holds that the Second Amendment Does Not Extend to Illegal Aliens Such As Defendant.

In *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), the Fifth Circuit rejected the very same constitutional challenge to § 922(g)(5)(A)'s prohibition of firearm possession that the defendant has raised here. Applying that binding precedent, this Court should deny Benito's motion.

In *Portillo-Munoz*, the Fifth Circuit recognized that the "people" referenced in the Second Amendment's text excludes noncitizens like Defendant Benito. The Court of Appeals explained that although neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *McDonald v. Chicago*, 561 U.S. 742 (2010), presented "the question of whether an alien, illegal or legal, has a right to bear arms, . . . the Court's language [in those decisions] does provide some guidance as to the meaning of the term 'the people' as it is used in the Second Amendment." 643 F.3d at 440 & n.1. In particular, the Fifth Circuit noted that *Heller* addressed the interest of "law-abiding, responsible citizens to use arms" and explained that the Second Amendment's use of the term "the people" does not extend beyond "'members of the political community.'" *Id.* at 440 (quoting *Heller*, 554 U.S. at 580-81, 635). The Fifth Circuit explained that "[t]he Court's language in *Heller* [and *McDonald*] invalidate[d] [the defendant's] attempt to extend the protections of the Second Amendment to illegal aliens," who "are not 'law-abiding, responsible citizens' or 'members of the political community,'" or "Americans as that word is commonly understood." *Id.* at 440 & n.1.

The Fifth Circuit further highlighted the Supreme Court's decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), which explained, in the context of a Fourth Amendment challenge, that the term "the people" excludes anyone who is not "part of [our] national community or who ha[s] otherwise developed sufficient connection with this country to be considered part of that community." The Fifth Circuit noted that the Supreme Court has never "held that the Fourth Amendment extends to a native and citizen of another nation who entered and remained in the United States illegally," and that "[a]ttempts to precisely analogize the scope of [the Second and Fourth] amendments is," in any event, "misguided." *Portillo-Munoz*, 643 F.3d at 440-41. Finally, the court found "persuasive" the fact that "the Constitution does not prohibit

3

Congress from making laws that distinguish between citizens and aliens and between lawful and illegal aliens." *Id.* at 442.

Following the Fifth Circuit's issuance of *Portillo-Munoz,* every court of appeals to have considered a Second Amendment challenge to § 922(g)(5)(A) has rejected it, albeit on varying grounds. *See United States v. Sitladeen*, 64 F.4th 978, 985-988 (8th Cir. 2023); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050 (11th Cir. 2022); *United States v. Perez*, 6 F.4th 448, 455-56 (2d Cir. 2021); *United States v. Torres*, 911 F.3d 1253, 1261-64 (9th Cir. 2019); *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015); *United States v. Carpio-Leon*, 701 F.3d 974, 977-81 (4th Cir. 2012); *United States v. Huitron- Guizar*, 678 F.3d 1164, 1168-70 (10th Cir. 2012). Some of these circuits affirmed § 922(g)(5)(A)'s constitutionality based on a two-step analysis in which the courts first considered whether the challenged law "burdens conduct protected by the Second Amendment," and then "determine[d] and appl[ied] the appropriate level of scrutiny," based on "how close the law comes to the core of the Second Amendment right and . . . the severity of the law's burden on the right." *Perez*, 6 F.4th at 451, 454 (quotation marks omitted). By contrast, the Fourth, Fifth, Eighth, and Eleventh Circuits have held that § 922(g)(5)(A) is constitutional because noncitizens who are illegally present fall outside the scope of the "people" protected by the Second Amendment.

### b. The Supreme Court's Decision in *Bruen* validates *Portillo-Munoz.*

In *Bruen*, the Supreme Court held that the Second Amendment protects the right of "lawabiding, responsible citizens" to "carry a handgun for self-defense outside the home."142 S. Ct. at 2156. The Court struck down a New York law that required residents to demonstrate a "proper[ ]cause" to obtain a license to carry a handgun outside the home because that law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to

4

keep and bear arms." *Id.* In reaching this conclusion, *Bruen* rejected the "'two-step'" Second Amendment framework adopted by most courts of appeals after *Heller* that "combine[d] history with means-end scrutiny." *Id.* at 2125; *see* p. 4, *supra* (summarizing the two-step framework). *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. But the Court "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

*Bruen* thus clarified the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation infringes such presumptively protected conduct, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The Court explained that the relevant "metrics" for assessing a regulation's constitutionality are "how and why the regulations burden a *law-abiding citizen's* right to armed self-defense." *Id.* at 2133 (emphasis added).

Although *Bruen* did not address the scope of the right as it pertains to a noncitizen who is unlawfully present in the United States, its analysis confirms the validity of the Fifth Circuit's holding in *Portillo-Munoz*. *Portillo-Munoz* conducted the type of analysis required by *Bruen* in concluding that the Second Amendment's text did not protect a noncitizen who is illegally present in the United States.  Importantly, the Fifth Circuit affirmed § 922(g)(5)(A)'s constitutionality on that basis and did not engage in the type of means-end scrutiny rejected in *Bruen*. Thus, because

the Fifth Circuit's analytical approach in *Portillo-Munoz* is consistent with the analytical framework presented in *Bruen*'s, *Portillo-Munoz* remains good law.

Moreover, just as one panel of the circuit court "may not overrule the decision, right or wrong, of a prior panel in the absence of any intervening contrary or superseding decision by the court en banc or the Supreme Court," a district court is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court. *See Society of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991). Therefore, *Portillo-Munoz* is binding precedent, and this Court must follow it in the absence of any authority to the contrary.

### c. Contrary to the Defendant's Assertion, Recent Fifth Circuit Cases Do Not Disturb *Portillo-Munoz*'s Holding.

Defendant Benito points to the Fifth Circuit's decisions in *Daniels* and *Rahimi* for his contention that the Second Amendment's use of "the people" covers noncitizens unlawfully presented in the United States. *See* Dkt. No. 17, at 5 (citing *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) and *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023)). Defendant Benito misreads these cases.

The Fifth Circuit's *Daniels* opinion concerns an American citizen, not a noncitizen. Moreover, the discussion at page 342 of *Daniels* (which the defendant cites in his brief) deals with whether a marijuana-using citizen is one of "the people" covered by the Second Amendment. *Daniels*, 77 F.4th at 342. It does not contain any discussion of the scope of the Second Amendment as applied to noncitizens, especially noncitizens who are unlawfully present. *Id*. (discussing only whether certain <u>citizens</u> are covered by the Second Amendment). Indeed, the cited page of the *Daniels* opinion reaffirms that the Second Amendment's use of the phrase "the people"

6

"*unambiguously* refers to all members of the political community." *Id*. (quoting *D.C. v. Heller*, 554 U.S. 570, 580 (2008)) (emphasis added).

The same is true of Defendant's Benito's citation to the *Rahimi* decision. *See* Dkt. No. 17, at 5 (citing *Rahimi*, 61 F.4th at 451). The *Rahimi* decision concerns whether a domestic-abusing citizen is one of "the people" covered by the Second Amendment. *Rahimi*, 61 F.4th at 451. It contains no mention of the scope of the amendment as to noncitizens, and certainly not to unlawfully present noncitizens. *Id*. Like *Daniels*, *Rahimi*—quoting Supreme Court precedent—affirms reaffirms that the Second Amendment's use of the phrase "the people" "*unambiguously* refers to all members of the political community." *Id*. (quoting *D.C. v. Heller*, 554 U.S. 570, 580 (2008)) (emphasis added).

Because neither *Daniels* nor *Rahimi* suggest that the Supreme Court's *Bruen* decision disturbs the either the Supreme Court's or the Fifth Circuit's prior holding that the Second Amendment applies to American citizens, Defendant Benito's reliance on those opinions is misplaced.

Defendant's Benito also suggests that a decade's old Supreme Court case (*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)) has abrogated the Fifth Circuit's 2011 precedent in *Portillo-Munoz*. *See* Dkt. No. 17, at 4-5. No such abrogation has occurred. When the Fifth Circuit decided *Portillo-Munoz*, it did so with knowledge of the statements in by the Supreme Court in *Verdugo-Urquidez* and *Heller*. *Bruen* did not mention *Verdugo-Urquidez*. Notwithstanding these realities, the defendant suggests that—without mentioning *Verdugo-Urquidez* at all, without deciding an issue involving noncitizens, and without disturbing its *Heller* decision—the *Bruen* court disturbed binding Fifth Circuit precedent related to the arms-bearing rights of unlawfully

7

present noncitizens. Not so. Because *Bruen* does not suggest that the Fifth Circuit's *Portillo-Munoz* decision is abrogated, that opinion remains good law, and this Court is bound by it.

### d. Even on Fresh Scrutiny, the Defendant's Constitutional Challenge Fails.

Even if *Bruen* required this Court to newly analyze this issue, the same outcome would hold: § 922(g)(5)(A) passes constitutional muster.

#### i. The Defendant is Not Among "The People" Protected by The Second Amendment's Plain Text.

By its terms, the Second Amendment protects the right of "the people" to keep and bear arms. U.S. Const. amend. II. In *Heller*, the Supreme Court explained that "the term ['the people'] unambiguously refers to . . . members of the political community." 554 U.S. at 580. The Court has observed elsewhere that "citizenship" is a required part of "membership in the political community" and that "[a]liens are by definition . . . outside of this community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438-40 (1982). Accordingly, after analyzing the phrase "right of the people," the Court in *Heller* determined that "the Second Amendment right is exercised individually and belongs to . . . *Americans*." 554 U.S. at 581 (emphasis added). The rest of the opinion likewise reflects the Court's understanding that the right to keep and bear arms does not belong to noncitizens. *See id.* at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right"); *id.* at 608 (right "enjoyed by the citizen"); *id.* at 625 ("weapons not typically possessed by law-abiding citizens"); *id.* ("possession of firearms by law-abiding citizens"); *id.* at 635 ("law-abiding, responsible citizens").

This limited understanding of the "people" referenced in the Second Amendment finds support in the historical record. Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but was instead expressly limited to "'Subjects.'"

8

*Heller*, 554 U.S. at 593 (quoting English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441)); *see id.* ("By the time of the founding, the right to have arms had become fundamental for English *subjects*.") (emphasis added)). "[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry," and under "English common law[,] . . . 'aliens [were] incapacitated to hold lands.'" *Jimenez-Shilon*, 34 F.4th at 1046 (quoting *Bayard v. Singleton*, 1 N.C. 5, 9 (1787)).

"The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo- American Right* 140 (1994)). Colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the political community. Massachusetts and Virginia, for example, forbade the arming of Native Americans, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). Indeed, while "[a]lien men" in colonial America "could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998); *see also Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment). During the American Revolution, colonial governments disarmed those who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.

Rev. 487, 506 (2004); *see id.* at 506 nn.128-29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments . . . framed their police power to disarm around a test of allegiance."). And during the ratification debates, the New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion," while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens*" the right to keep arms. 2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, at 681, 761 (1971) (emphases added); *see Heller*, 554 U.S. at 603-04 (describing ratification conventions' proposals as "Second Amendment precursors").

The Bill of Rights codified the principle that membership in the political community is a prerequisite for the right to bear arms. *See McDonald*, 561 U.S. at 769- 70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)). Indeed, "Framing-era sources 'refer to arms-bearing as a *citizen's* right' that was closely associated with national fealty and membership in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources and quoting Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)). Accordingly, "many early state constitutions . . . expressly limited the right to keep and bear arms to 'citizens.'" *Id.* at 1049 (collecting Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (discussing the same constitutions).

10

Set against this historical background, the defendant—a noncitizen present in the United States unlawfully—cannot reasonably contend that he is within the class of persons to which the Second Amendment's protection applies. The defendant is a noncitizen who was present in the United States unlawfully at the time he was found in possession of a firearm. And even if a noncitizen could develop "substantial" enough "connections" with the United States to permit him to "invoke the protections of the Second Amendment," *Meza-Rodriguez*, 798 F.3d at 670, the defendant's "connections" are not substantial enough. Thus, because the Second Amendment does not reach noncitizens like Defendant Benito, his challenge fails.

### ii. Section 922(g)(5)(A) is Consistent with This Nation's Tradition of Firearms Regulation.

Assuming the Second Amendment's plain text applies in some measure to noncitizens like the defendant, § 922(g)(5)(A) still passes constitutional muster. The right to keep and bear arms is not "unlimited" and remains subject to "lawful regulatory measures" that are "fairly supported by . . . historical tradition." *Heller*, 554 U.S. at 626-27 & n.26 (quotation marks omitted). The government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Courts may "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by assessing "whether the two regulations are 'relevantly similar.'" *Id.* at 2132. In doing so, courts should then examine "how and why the regulations burden a law-abiding citizen's right to armed selfdefense." *Id.* at 2133.

Two historical markers carry particular salience with respect to noncitizens who are present in the United States unlawfully. First, there is abundant precedent before, during, and after the American Revolution for disarming individuals who were not members of the political community. *See* pp. 5-7, *supra*; *see also Perez*, 6 F.4th at 462 n.4 (Menashi, J., concurring in the judgment)

("[A]rms bearing and suffrage were intimately linked two hundred years ago and have remained so." (quotation marks omitted)). In particular, laws barring Native Americans, Catholics, and Loyalists from bearing arms demonstrate that the right to bear arms was understood to be limited to those within the political community.

Second, history shows that legislatures may disarm persons who pose a "real danger of public injury," *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quotation marks omitted). In England, for example, officers of the Crown had the power to disarm persons who were "dangerous to the Peace of the Kingdom." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (quotation marks omitted). And in Revolutionary America, legislatures often disarmed those who refused to "swear[] fidelity to the revolutionary regime," "who defamed resolutions of the Continental Congress," or "who were unwilling to abide by . . . legal norms." *Range v. Atty Gen.*, 69 F.4th 96, 125 (3rd Cir. 2023) (Judge Krause, dissenting).

Section 922(g)(5)(A) fits comfortably within these historical traditions. *See, e.g.*, *Meza-Rodriguez*, 798 F.3d at 673. Noncitizens without lawful status have, by definition, "already violated a law of this country" by entering or remaining in the United States illegally. *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984). Further, noncitizens without lawful status may be less likely to comply with the identification and recordkeeping requirements associated with purchasing firearms from licensed dealers, because they often live "largely outside the formal system of registration, employment, and identification" and can be "harder to trace and more likely to assume a false identity." *Huitron-Guizar*, 678 F.3d at 1170. Noncitizens without lawful status also "have an interest in eluding law enforcement," creating a risk that they could misuse firearms against immigration authorities attempting to apprehend them. *Meza-Rodriguez*, 798 F.3d at 673;

*cf.* 18 U.S.C. § 922(g)(2) (disarming fugitives). Congress could thus reasonably conclude that the noncitizens who fall within § 922(g)(5)(A) should be disarmed.

It does not matter that the Founding-era laws are not identical to § 922(g)(5)(A). *Bruen* recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. The key question under *Bruen* is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133. In this regard, the government need not identify "a dead ringer for historical precursors"; "a well-established and representative historical analogue" will suffice. *Id.* (emphasis omitted). The historical markers identified above—disarming individuals who lacked membership in the political community or who were unwilling to comply with the law—plainly align with § 922(g)(5)(A)'s prohibition. Compared to those historical regulations, § 922(g)(5)(A) imposes an identical burden on the right to armed self-defense. That burden is also "comparably justified." *Id.* At the time of the founding, disarmament was considered necessary to protect against the danger to the "civic community" posed by those refusing to abide by its legal and social norms. *See Range*, 69 F.4th at 124-126 (Judge Krause, dissenting). Section 922(g)(5)(A) is similarly justified by an illegally present non-citizen's lack of membership in the political community and the challenges presented by their possession of firearms.

One final consideration merits mention in this inquiry. Courts traditionally afford Congress significant deference in matters relating to citizenship and immigration. "[T]he responsibility for regulating the relationship between the United States and our alien visitors"—determinations about which noncitizens should be allowed to enter and remain in the United States and the terms and conditions imposed upon such noncitizens while they are here—is "committed to the political

branches" of government. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). In exercising that power, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Id.* at 80. And because Congress's "power over aliens is of a political character," its exercise of that power is "subject only to narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101-02 n.21 (1976); *see Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (holding that congressional power over noncitizens is "largely immune from judicial control"). Congress was entitled to determine that noncitizens who are unlawfully present in the United States, and are therefore potentially subject to removal, should not be permitted to possess firearms while they are here. That consideration further confirms what the historical record shows: § 922(g)(5)(A) reflects a constitutional regulatory measure.

## II.     Conclusion

Based on the foregoing, the United State's respectfully moves the Court for an order denying the defendant's Motion to Dismiss [ECF Doc. 17].

RESPECTFULLY SUBMITTED this the 12th day of April, 2024.

TODD W. GEE
UNITED STATES ATTORNEY

By: /s/ *Samuel Goff*
Assistant United States Attorney
Mississippi Bar No. 105813
501 E. Court Street, Ste. 4.430
Jackson, Mississippi 39201
Phone: (601) 965-4480
Samuel.goff@usdoj.gov

14

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all parties of record.

/s/ *Samuel Goff*
Assistant United States Attorney