# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**UNITED STATES OF AMERICA**

**V.**                                                    **CRIMINAL NO. 3:24CR26-CWR-ASH**

**PEDRO MUNOZ BENITO**

### REPLY TO MOTION TO DISMISS

COMES now, the defendant, Pedro Munoz Benito, and files his reply to the Motion to Dismiss. The Government has failed to meet its burden to establish a historical tradition of disarming people similarly situated to Mr. Benito, as required by *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). For the following reasons, the Court should grant Mr. Benito's motion and dismiss the Indictment because 18 U.S.C. § 922(g)(5) is unconstitutional.

**I.        The Fifth Circuit has abrogated all of its pre-*Bruen* jurisprudence.**

Contrary to the Government's argument, in *United States v. Rahimi*, 61 F. 4th 443 (5th Cir. 2023), the Fifth Circuit abrogated its entire body of Second Amendment jurisprudence. The Fifth Circuit held that *Bruen* met the standard for overturning Second Amendment cases in this circuit because *Bruen* was "an intervening supreme Court decision [that] fundamentally changes the focus of the relevant analysis." *Id.* at 450 (internal citation and quotation marks omitted). The Fifth Circuit was explicit in its holding: *Bruen* so fundamentally altered the landscape of Second Amendment that it "render[ed] our prior precedent *obsolete*." *Id.* at 451. Accordingly, this Court may not rely on *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) as binding precedent.

II.     ***Portillo-Munoz* is not consistent with *Bruen*.**

The Government contends that *Portillo-Munoz* remains good law or, alternatively, that it is consistent with *Bruen*. Reviewing *Portillo-Munoz* through the lens of *Bruen*, however, highlights the reasons that the Fifth Circuit held that its Second Amendment jurisprudence was abrogated. The Supreme Court used *Bruen* to establish that the intermediate-scrutiny standard adopted by the Circuit Courts of Appeals following *District of Columbia v. Heller*, 554 U.S. 570 (2008) was improper. *Bruen* clarified that the test for analyzing restrictions on Second Amendment rights is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen* 142 S.Ct. 2129-30. *Bruen* reiterates over and over that courts should apply the test set forth in *Heller*.

*Bruen* gives only passing reference to the phrase "the people" because there was no question as to whether the petitioners fell within the Second Amendment's definition of "the people." *Heller*, however, does analyze the term "the people." *Heller*, 554 U.S. at 580. *Heller* observes that the phrase "the people" is a term of art utilized in the context of other individual rights, including the First Amendment and the Fourth Amendment. And *Bruen* holds that Second Amendment restriction must be analyzed according to the same standards applied to the First Amendment and the Fourth Amendment. *Bruen*, 142 S.Ct. at 2130. Accordingly, the protections of the First, Second, and Fourth Amendment stand on equal footing.

Notably, *Heller* defines "the people" broadly as "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 265 (1990)). *Verdugo-Urquidez* has been interpreted to provide Fourth Amendment protection to illegal aliens with substantial connections to the United States. *See Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006).

It is here where *Portillo-Munoz* diverges from the requirements of *Heller* and *Bruen*. Rather than treating the Second Amendment as being on equal footing and subject to the same analysis as the First and Fourth Amendments, *Portillo-Munoz* holds the opposite, stating that "we do not find that the use of 'the people' in both the Second and the Fourth Amendment mandates a holding that the two amendments cover exactly the same group of people" *Portillo-Munoz*, 643 F.3d at 440. *Bruen* and *Heller* say that they do. Mr. Benito has sufficient connections to the United States. He has lived in the United States for several years and has both family connections and employment history here. Accordingly, Mr. Benito is entitled to Second Amendment protection as one of "the people."[1]

**III.    The historical analogues put forth by the Government are not relevantly similar and contradict the historical record.**

The Government ignores the historical record presented in the Motion – namely, the fact that no law restricted immigration itself, much less the constitutional rights afforded to those immigrants, until 1875, almost a century after the Founding. Instead, the Government raises one argument that conflates the analysis of "the people" with the historical tradition test and puts forth

---

[1] The Government's reliance on *United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) and the sources cited within is unpersuasive for several reasons. First, the majority opinion in *Perez* deliberately sidestepped the question of whether an illegal alien is protected by the Second Amendment. Second, *Perez* was decided pre-*Bruen* and relied on the now-defunct intermediate scrutiny test to affirm the conviction under 18 U.S.C. § 922(g)(5). Third, the concurring opinion, upon which the Government relies, conflates citizenship with loyalty. The defense addresses that conflation in the historical tradition analysis, *infra*.

a generic argument that Mr. Benito's undocumented status renders him dangerous because he is not loyal to the United States. These arguments fail.

### A. The Government's argument that citizenship equals suffrage which equals the right to bear arms is not supported by historical evidence.

The Government first contends that "there is abundant precedent before, during and after the American Revolution for disarming individuals who were not members of the political community." Response, ECF No. 18 at 11. That "abundant precedent" is a citation to the concurring opinion in *Perez* and one source that states "arms bearing and suffrage were intimately linked two hundred years ago and have remained so." *See id.* The Government's theory, then, is that America's historical tradition linked constitutional rights to citizenry, and citizenship was defined by the right to vote.

Setting aside the obvious problems with that analogy – that many colonial-era Americans who were citizens lacked the right to vote because they were not white, male landowners -- alien suffrage has a long history in the United States. *See* Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional, and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1399-1401 (1993). Most colonies allowed non-citizens to vote, so long as they "met the appropriate property, wealth, race, religion, and gender tests." *Id.* at 1399 (listing Pennsylvania, Vermont, Delaware, Massachusetts, New Hampshire, South Carolina, and Virginia as colonies/states that permitted alien suffrage). Notably,

> In 1789, the first Congress to convene under the Constitution reenacted the Northwest Ordinance of 1787 to provide for the governance of the territories northwest of the Ohio River. The Ordinance gave freehold aliens who had been residents for two years the right to vote for representatives to territorial legislatures, and gave wealthier resident aliens who had been residents for three years the right to serve in these bodies.

*Id.* at 1402. Accordingly, alien suffrage – a sign of belonging to the political community – was widely practiced at the time of the Founding. If the Court takes the Government's argument that the right to bear arms was linked to suffrage at face value, the Government's analogy fails to establish that aliens do not fall under the protection of the Second Amendment.

### B. The Government's argument on disarming dangerous or disloyal persons is rooted in racism, religious discrimination, and bigotry and is not historically analogous.

The Government's second argument is that England had a historical tradition of disarming those persons who "pose[d] a 'real danger of public injury'" and that the colonies disarmed those who refused to swear loyalty to the fledgling United States. Response, ECF No. 18 at 12. This argument is simply a re-framing of the Government's first argument that citizenship equals loyalty equals Second Amendment rights. Additionally, this tradition of disarming those perceived to be dangerous or disloyal is rooted in racism, religious discrimination, and bigotry. That historical tradition disarmed Native Americans, Catholics, and black people, both enslaved and freed. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263-64, 269-70 (2020). Certainly, this type of discriminatory history should not serve as a basis to justify upholding § 922(g)(5), even if it were "distinctly similar."

To the extent that the Government is arguing that non-citizens fall within the historical tradition of disarming "dangerous" people, the definition of danger has been widely understood as danger to the public safety. *See, e.g., Kanter v. Barr*, 919 F.3d 437, 451 (Barrett, J. dissenting) Then-Judge Barrett reasoned that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*." *Id.* (emphasis in original). She also reasoned that a

person's *status*, like "felon" – or in this case, "illegal alien" – was insufficient to justify stripping a person of his Second Amendment rights. *See* Kanter, 919 F.3d at 452.

The Government's argument that simply being an "illegal alien" qualifies Mr. Benito as a dangerous person has no historical basis and is without merit. There is no historical tradition of stripping noncitizens of constitutional protections simply because they were not citizens, in large part because America's historical tradition was an open immigration system in which noncitizens lived under the same protections as citizens and were granted citizenship based upon the fact of their residency for a specified period of time.

The Government makes much of the fact that illegal entry into the United States is considered a crime, but a first violation of 8 U.S.C. § 1325 is a misdemeanor. More importantly, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." 567 U.S. 387, 407 (2012) (citing *INS v. Lopez–Mendoza,* 468 U.S. 1032, 1038 (1984)). Accordingly, immigration status alone does not establish dangerousness. The cases upon which the Government relies for the proposition that undocumented immigrants pose a risk are all pre-*Bruen* cases that rely on the now-discarded means-end test *See, e.g., United States v. Meza-Rodriguez*, 798 F.2d 664 (7th Cir. 2015).[2] Additionally, at least one court has rejected the Government's argument that undocumented immigrants are *per se* dangerous. *See id.* at 674 (stating "The government also argues that § 922(g)(5) reflects the likelihood that unauthorized immigrants are more likely to commit future gun-related crimes than persons in the general population. It offers no data to support that assertion, however, and we have our doubts about its accuracy." The Court noted that this point was particularly relevant in cases where the person was

---

[2] Notably, in *Meza-Rodriguez*, the Seventh Circuit held that, under *Heller*, the defendant was entitled to Second Amendment protection as one of "the people" before concluding that § 922(g)(5) passed intermediate scrutiny.

brought to the United States as a child and did not have the requisite intent to violate the statute by entering the country.).

In any event, there is no historical tradition of disarming noncitizens because they are *per se* dangerous people. A search for laws applying to "aliens" and "unnaturalized" persons in the Duke Center for Firearms Law, which boasts a comprehensive repository of historical firearms regulations, yields only 20th century state statutes *See* https://firearmslaw.duke.edu/repository/search-results/?_sf_s=alien (last visited July 20, 2023).; https://firearmslaw.duke.edu/repository/search-results/?_sf_s=unnaturalized (last visited July 20, 2023). Additionally, 18 U.S.C. § 922(g)(5) does not disarm all noncitizens – only those who enter the country without documentation. These modern statutes are insufficient to establish a historical tradition. *See Bruen*, 142 S.Ct. at 1236 (emphasizing that "not all history is created equal"). Accordingly, the Government's argument that "illegal aliens" are *per se* dangerous and that this conclusion may be applied to a historical analogue of disarming those who threaten the public safety fails.[3]

## IV.   Conclusion

The Government has failed to meet its burden to establish that Mr. Benito falls outside the scope of those persons subject to Second Amendment protection. The Government also failed to meet its burden to demonstrate that the United States has a historical tradition of disarming "illegal

---

[3] The Government, in its Response, also attempts to argue that the facts of this case establish that Mr. Benito is actually dangerous. Mr. Benito submits that some of the facts upon which the Government relies may be subject to suppression as violative of Mr. Benito's Fifth Amendment right against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Mr. Benito intends to file a Motion to Suppress that, if granted, may impact the Court's analysis on the issue of whether Mr. Benito is a dangerous person.

7

aliens." Therefore, 18 U.S.C. § 922(g)(5) is unconstitutional as violative of the Second Amendment.

WHEREFORE, Mr. Benito respectfully asks this Court to grant his Motion to Dismiss the Indictment.

Respectfully submitted, this the 17th day of April, 2024.

**PEDRO MUNOZ BENITO,**
**Defendant**

BY:     /s/  *Princess Abby*
          Princess Abby (MB # 106000)
          Assistant Federal Public Defender
          Southern District of Mississippi
          200 S. Lamar St., Suite 200 North
          Jackson, Mississippi 39201
          Telephone: (601)948-4284
          Facsimile: (601)948-5510
          Email:  princess_abby@fd.org

          Attorney for Defendant


## CERTIFICATE OF SERVICE

I, Princess Abby, certify that on April 17, 2024, this Reply was filed with the Clerk of the United States District Court for the Southern District of Mississippi, using the electronic case filing system, which in turn sent an electronic copy of this Motion to all attorneys of record in this case.

/s/ *Princess Abby*
Attorney for Defendant