**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| *Plaintiff*, | |
| v. | CAUSE NO. 3:24-CR-26-CWR-ASH |
| **PEDRO MUNOZ BENITO**, | |
| *Defendant*. | |

**ORDER**

In this case, the government alleges that Pedro Munoz Benito knowingly possessed a firearm while unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5).

Now before the Court is Mr. Benito's motion to dismiss. He argues that the Second Amendment prohibits his prosecution because America does not have a historical tradition "of disarming people based on their immigration status." Docket No. 17 at 6. In fact, he says, "America's historical tradition was an open immigration system in which noncitizens lived under the same protections as citizens and were granted citizenship based upon the fact of their residency for a specified period of time." Docket No. 19 at 6.

Mr. Benito's argument used to be foreclosed by Fifth Circuit precedent. That was before *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). In that case, the Supreme Court directed lower courts to apply a new legal standard—one that is more protective of Second Amendment rights.

Applying that new standard, the Court finds that Mr. Benito's arguments have merit. His motion is therefore granted and the indictment dismissed.

I.      **Factual and Procedural History**

In February 2024, police officers in Clinton, Mississippi responded to a resident who complained of hearing gunfire. The officers found Andres Vazquez-Lopez and Pedro Munoz Benito intoxicated in the cab of a pickup truck. Spent shell casings outside the truck suggested that someone had fired a weapon.

The police arrested Mr. Vazquez-Lopez for driving under the influence. A search of the truck turned up a 9mm pistol. After hearing and then waiving his *Miranda* rights, Mr. Benito apparently admitted to purchasing the pistol. He said he and Mr. Vazquez-Lopez had taken turns shooting the pistol in the air.

The police arrested Mr. Benito and Mr. Vazquez-Lopez and charged them with shooting in city limits and operating a motor vehicle while intoxicated. (The record is not entirely clear as to whether or why Mr. Benito was charged with the DUI.) The police officers then determined that Mr. Benito and Mr. Vazquez-Lopez were citizens of Mexico without authorization to be in the United States.

The officers contacted U.S. Immigration Customs and Enforcement (ICE). ICE promptly sought and received an arrest warrant charging Mr. Benito with possessing a firearm while unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5).

Within a week, a federal grand jury in this District returned an indictment charging Mr. Benito with violating 18 U.S.C. § 922(g)(5). In addition to a term of incarceration, which will presumably be followed by deportation, the government seeks the forfeiture of Mr. Benito's 9mm pistol and magazine.

Counsel was appointed to represent Mr. Benito on the charge. The present motion followed. Mr. Benito remains in federal custody.

## II. Legal Standards

The Supreme Court's new standard for Second Amendment challenges provides as follows:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17 (citation omitted). This standard abrogated Fifth Circuit precedent. *See id.* at 19 n.4 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194-95 (5th Cir. 2012)). Courts are expected to "hew closely to *Bruen's* own reasoning and hold the government to its *heavy* burden." *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023) (emphasis added).[1]

Mr. Benito's motion is an as-applied challenge to 18 U.S.C. § 922(g)(5). That means he challenges the government's prosecution of him, not its prosecution of other persons also accused of violating § 922(g)(5). In an as-applied challenge, the Court asks whether a law with some permissible uses "is nonetheless unconstitutional as applied to appellant's activity." *Spence v. Washington*, 418 U.S. 405, 414 (1974).

## III. Discussion

The parties' arguments will be addressed in turn.

---

[1] As this Order was going to press, the Supreme Court vacated *Daniels* and remanded the case to the Fifth Circuit for further consideration in light of *Rahimi*. *United States v. Patrick*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024).

### A. Is Mr. Benito's Argument Foreclosed by Precedent?

The government begins by claiming that Mr. Benito's challenge is foreclosed by *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011). In that case, the Fifth Circuit rejected a defendant's argument that the Second Amendment prohibited his prosecution for violating § 922(g)(5). The court found that "aliens who enter or remain in this country illegally and without authorization are not Americans as that word is commonly understood." *Id.* at 440.

That is the wrong legal standard. As the below discussion makes clear, the correct standard, both then and now, requires courts and litigants to look at a person's "substantial connections" to the country, not whether they are "Americans." *See infra* Part III.B.[2]

When confronted with that problem, the *Portillo-Munoz* court fell back to a belief that the term 'the people' in the Second Amendment protects fewer persons than the term 'the people' in the Fourth Amendment. 643 F.3d at 440-41. But that reasoning was flatly rejected in *Bruen*, when the Justices refused to allow the Second Amendment to be a second-class right. *See* 597 U.S. at 24 (concluding that Second Amendment interpretation should "accord[] with how we protect other constitutional rights."). It follows that *Portillo-Munoz* is "unequivocally out of step" with Supreme Court precedent.[3] *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021).

---

[2] Even if it were right on the law, though, a standard this subjective could have unintended consequences for cases like Mr. Benito's. There are few things more "American" than loving beer, trucks, and guns. *See* Libby Nelson, *Budweiser Renamed its Beer "America" Because it's no Longer America's Beer*, Vox (May 10, 2016); Lee Cowan, *America's Love Affairs With Pickup Trucks*, CBS News (Dec. 18, 2022); Jennifer Mascia & Chip Brownlee, *How Many Guns Are Circulating in the U.S.?*, The Trace (updated March 12, 2024) (reporting that in 2020, the National Shooting Sports Foundation estimated there to be 433.9 million firearms in civilian possession).

[3] *Portillo-Munoz* may also have a rule of orderliness issue with *Martinez-Aguero v. Gonzalez*, which explained that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with the country." 459 F.3d 618, 624 (5th Cir. 2006) (citation omitted); *see United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir. 2017) (explaining that under the rule, "to the extent that a more recent case contradicts an older case, the newer language has no effect.").

Another district court in this Circuit agrees that *Portillo-Munoz*, "together with the rest of the Fifth Circuit's pre-*Bruen* body of Second Amendment caselaw, has been abrogated." *United States v. Sing-Ledezma*, --- F. Supp. 3d ---, 2023 WL 8587869, at *6 (W.D. Tex. Dec. 11, 2023) (citations omitted). The Fifth Circuit has found that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment, rendering our prior precedent obsolete." *United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir. 2023) (cleaned up); *see Daniels*, 77 F.4th at 355 n.44 (declining to "rel[y] reflexively on pre-*Bruen* caselaw"). And the Supreme Court's latest decision in *Rahimi* didn't disagree with that premise in the slightest. Although the Justices parted ways with the Fifth Circuit's outcome, they doubled-down on the legal standard they articulated in *Bruen*. *See United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at *6 (U.S. June 21, 2024).

The bottom line is that Mr. Benito's case must be decided under the standards the Supreme Court provided in *Bruen* and *Rahimi*.

B.    **Which "People" Does the Second Amendment Protect?**

The next issue is whether persons present in the United States without authorization—*i.e.*, "undocumented" persons—are among "the people" protected by the Second Amendment to the U.S. Constitution.

The Constitution uses the term "the people" to mean "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). In other words, undocumented persons are entitled to Constitutional protection "when they have come

within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271.[4]

Persons have "developed substantial connections with the country" when they "are in this country voluntarily and presumably have accepted some societal obligations." *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (cleaned up). In that case, for example, the Fifth Circuit found that a Mexican citizen who visited the United States once a month to assist a relative had substantial connections to this country, and therefore received Constitutional protection, because she reasonably relied upon consular officials' statements that her expired border crossing card was valid and acquiesced "in the U.S. system of immigration." *Id.* at 625 & n.8.

Invoking this standard, Mr. Benito argues that he is among "the people" protected by the Constitution. His brief says he "has spent the last three years of his life here in the United States in the state of Mississippi. His cousin, uncle, four siblings, and a brother-in-law also reside in the United States." Docket No. 17 at 5. He has worked here as a painter and a roofer. These facts are drawn from a Pretrial Services Report that the U.S. Probation Office provided to the U.S. Magistrate Judge. Docket No. 12-1.

The government responds that Mr. Benito cannot seek the protection of the Second Amendment because his connections with the country "are not substantial enough." Docket No. 18 at 11. It provides no explanation for that conclusion. It does not, for example, contend that 'three years isn't enough time,' or that 'Mr. Benito's family members don't count as

---

[4] There is no dispute that Mr. Benito was in the United States at all times relevant to the indictment.

6

substantial connections.' It is not clear what temporal, familial, or employment connections the government believes would be material.

Instead, the government presents broad arguments that would narrow the scope of the Second Amendment. It leans most heavily on the idea that the Second Amendment never protects noncitizens. Each argument will be taken in turn.

The government first contends "that the right to keep and bear arms does not belong to noncitizens." Docket No. 18 at 8. That argument, though, is directly contrary to the Supreme Court's definition of "the people" in *Heller* and *Verdugo-Urquidez*, as well as the Fifth Circuit's definition in *Martinez-Aguero*. Those cases rejected a binary, 'are-you-a-citizen-or-not' approach to Constitutional rights, instead electing for a case-by-case determination based on the individual's connections with the country.

The government then tries to bolster its admittedly "limited" definition of the term "the people" with history, claiming that "the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry." *Id.* at 8-9. It is not clear what the government is arguing for. Nothing in the record indicates whether Mr. Benito is or is not part of the landed gentry. Surely the United States Department of Justice, our government, is not contending, in the year 2024, that the Second Amendment right to keep and bear Arms is limited to property owners. And not just property owners, but a sub-class of property owners—those who live entirely off of rental income. The relevant precedent does not adopt such a limited definition of "the people."[5]

---

[5] The Court is not sure that the textual inquiry *Heller* and *Bruen* require—*i.e.*, seeking an understanding of the term "the people"—should be as intertwined with the historical inquiry as the government has advanced here. The Court has nevertheless addressed the arguments in the order of their presentation.

7

The government leans in. It says that the Second Amendment does not protect Mr. Benito because "Massachusetts and Virginia . . . forbade the arming of Native Americans, and Virginia also prohibited Catholics from owning arms unless they swore allegiance to the Hanoverian dynasty and to the Protestant succession." *Id.* at 9. This is a bizarre argument. It is not clear why 21st century Americans should defer to many early Americans' racist beliefs about Native Americans or religious intolerance toward Catholics. Our Department of Justice surely knows that the First and Fourteenth Amendments counsel against such racial or religious classifications.[6]

Next, the government says the Second Amendment is limited to citizens because at "the ratification debates" in New Hampshire and Massachusetts, delegates urged amendments that would limit gun rights to citizens. *Id.* at 10. But those proposals never became law. And "[u]sually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended." *Daniels*, 77 F.4th at 352 (citation omitted); *see Heller*, 554 U.S. at 590 ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."). If anything, these failed amendments suggest that the Second Amendment was intentionally written to expand gun rights *beyond* just citizens.

The government fares no better when it pivots to draw support from early state constitutions that protected gun rights only for citizens. Docket No. 18 at 10. The comparison suggests that the authors of the Second Amendment took a broader view of gun rights than

---

[6] Admittedly the Fourteenth Amendment came after the Second Amendment, but it shapes constitutional interpretation today and cannot be ignored. It certainly is not a second-class amendment.

the states, at least as they related to citizenship qualifications. The federal Constitution would *not* limit gun rights on the basis of citizenship.

Last but not least, several lines in the government's brief advance the notion that the Second Amendment protects only "responsible" people. *E.g.*, *id.* at 3-4. The *Rahimi* court rejected that unworkable standard, noting that "responsible" was too "vague" and "unclear" a term to administer. 2024 WL 3074728, at *11.[7]

In short, the government's categorical arguments for restricting the Second Amendment to citizens (or perhaps to landed gentry) run contrary to precedent, other Constitutional text, and common sense. They fail to persuade.

The government has, moreover, presented no reason in this as-applied challenge as to why Mr. Benito in particular lacks the substantial connections necessary for him to receive protection of the Constitution. The record instead contains evidence of three years of his residence in Mississippi, significant familial connections, and continuous employment as a painter and a roofer. The government has no rebuttal. That is not enough to meet its heavy burden in this "adversarial system of adjudication" that "follow[s] the principle of party presentation." *Bruen*, 597 U.S. at 25 n.6.

For these reasons, the Court finds that Mr. Benito is presumptively protected by the text of the Second Amendment.[8]

---

[7] The Court notes that the government filed its brief before *Rahimi* was handed down, but it has made no attempt to square its current arguments with this decision.
[8] The parties' arguments have debated the Second Amendment consequences of Mr. Benito's *status* (as an undocumented person), rather than the Second Amendment consequences of the charged *conduct* (possessing a pistol and a magazine). In other words, no party disputes that the mere possession of a firearm is presumptively protected by the Second Amendment.

C.     **Has the Government Justified Disarmament in History and Tradition?**

The final step of the analysis requires the government to show that its desired Second Amendment restriction is consistent with America's history and tradition of firearm regulation.

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances. . . .
>
> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.

*Rahimi*, 2024 WL 3074728, at *6 (cleaned up).

In this portion of his argument, Mr. Benito argues that early American law did not disarm immigrants. There actually were no immigration restrictions in place at America's founding or for the next century, he says, so there necessarily were no firearms restrictions on "immigrants." In his view, that renders § 922(g)(5) unconstitutional as applied to him.

There is no dispute about § 922(g)(5)'s age. Other cases describe how it originated in the Gun Control Act of 1968, and in its current form was included in the Firearm Owners Protection Act of 1986. *Sing-Ledezma*, 2023 WL 8587869, at *8. The Department of Justice has conceded elsewhere that the United States did not restrict immigration until 1875. *See United States v. Vazquez-Ramirez*, No. 2:22-CR-87-RMP-1, 2024 WL 115224, at *8 (E.D. Wash. Jan. 10, 2024). The statute can therefore be enforced only if it is "relevantly similar to laws that our

10

tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 2024 WL 3074728, at *6 (cleaned up).

To its credit, the government does not maintain that early Americans disarmed or feared immigrants. That would be preposterous. Early Americans *were* immigrants.

The government instead re-urges its argument about America's history of disarming out-groups like Native Americans and Catholics. *If they did it then*, the argument goes, *we can do it now*. Setting aside for a moment how odious and shameful it is to make this argument in a land upon which millions of Native Americans lived before European colonization, and in a Nation where tens of millions of Americans are descendants of slaves, Native American and Catholic disarmament fails the 'how and why' test outlined in *Bruen* and *Rahimi*.

Colonial and early Americans disarmed Native Americans and Catholics for a variety of reasons. Manifest Destiny was part of the story: "colonial gun laws continually sought to limit Indian access to firearms" because Native Americans had "resisted the conquest of their lands" for 200 years. Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 574 (1998). Religious intolerance certainly played a role in the disarmament of Catholics. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020). Other early Americans likely feared "that these groups would use guns to revolt or otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) (citation omitted). Perhaps bigotry, religious intolerance, and fear were all legs propping up the same stool—guns for me but not for thee. But bigotry and religious intolerance are obviously unconstitutional reasons to restrict Constitutional rights

today. We must always deal with the whole Constitution. Here our Department of Justice ignores the First and Fourteenth Amendments.

That leaves the "public safety" rationale. Although racism, religious intolerance, and exaggerated fears are typical pretextual reasons to engage in unlawful discrimination, the government and indeed "the People" retain a substantial interest in passing laws that protect public safety. No one questions that premise.

The problem is this: there's no evidence that undocumented immigrants are more dangerous than documented immigrants or citizens. Study after study indicates the opposite.

A "uniquely comprehensive" data set from Texas shows that "undocumented immigrants have substantially lower crime rates than native-born citizens and legal immigrants across a range of felony offenses." Michael T. Light et al., *Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas*, 117 Proceedings of the Nat'l Academy of Sci. 32340 (2020). "Relative to undocumented immigrants," in fact, "US-born citizens are over 2 times more likely to be arrested for violent crimes, 2.5 times more likely to be arrested for drug crimes, and over 4 times more likely to be arrested for property crimes." *Id.* Other studies confirm that a "general pattern," where "native-born Americans hav[e] the highest criminal conviction rates followed by illegal immigrants and then with legal immigrants having the lowest," holds true "for all [] other specific types of crimes such as violent crimes, property crimes, homicide, and sex crimes." Alex Nowrasteh, *New Research on Illegal Immigration and Crime* (Oct. 13, 2020) (citing Cato Working Paper No. 60). Put simply, fear of undocumented immigrants causing crime is yet another pretextual policy justification. It warrants no deference in a court of law.

Returning to the *Bruen-Rahimi* standard, the government then justifies immigrant disarmament with two historical examples: (1) English officers had the power to disarm persons deemed dangerous, and (2) some legislatures in revolutionary America disarmed persons who refused to swear loyalty to the revolution or defamed the Continental Congress. Docket No. 18 at 12.

The Court remains sympathetic to the principle that American history and tradition support disarmament of dangerous persons. Justice Barrett persuasively explained why when she sat on the Seventh Circuit. *See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). But Mr. Benito has never been convicted of a crime, much less a dangerous crime, so he can't be disarmed yet.

The remaining examples, meanwhile, cannot be enforced without violating existing law. The First Amendment obviously protects criticism of public officials. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Constitutional protections are not predicated upon loyalty oaths, *see Verdugo-Urquidez*, 494 U.S. at 271, which for that matter are Constitutionally suspect, *see Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967). And it should be noted that millions of undocumented immigrants in this country *want to* and *would* swear loyalty to the United States if only given the opportunity.[9]

The government's argument returns to citizenship. Because Mr. Benito is in the country without legal authorization, it suggests, he's already a dangerous lawbreaker who can be disarmed. Docket No. 18 at 12. Missing here is any evidence of history or tradition

---

[9] *See* U.S. Citizenship and Immigration Services, Citizenship Resource Center, Naturalization Statistics (last accessed July 3, 2024) (noting that "USCIS welcomed more than 7.7 million naturalized citizens into the fabric of our nation" during the last decade). According to a 2015 article, three federal Judges in this District "owe their status as citizens to immigrant parents." Terryl Rushing, *From the Federal Bench: Personal Perspectives on Naturalization*, Capital Area Bar Assoc. (April 2015).

13

demonstrating that disarmament based on immigration status is consistent with "what was done at the founding." *Rahimi*, 2024 WL 3074728, at *6.

In the late 1700s, "the notion of illegal immigration did not exist." *Sing-Ledezma*, 2023 WL 8587869, at *10 (collecting sources). In the early 1800s, "foreigners who arrived in the United States were not deemed 'illegal' upon entry and were not subject to inspection." *Id.* at *11. The notion of "legal authorization" to be here was laughable. It ignores history. The land was forcibly appropriated from Native Americans by immigrants, and early American society encouraged more immigration so it could settle that land. Unsurprisingly, then, the government has pointed to no evidence that "in the 18th or 19th century," the government disarmed immigrants based upon their status. *Daniels*, 77 F.4th at 340. Such steps would have come as a shock to "financier of the revolution" Robert Morris (born in England), our Nation's first Secretary of the Treasury Alexander Hamilton (born in Nevis), and signatory-to-the-Constitution-turned-Supreme-Court-Justice William Paterson (born in Ireland). Because the principle was abhorrent to the founding era, it fails *Bruen* and *Rahimi*.

Finally, the government says that "because Congress's power over aliens is of a political character, its exercise of that power is subject only to narrow judicial review." Docket No. 18 at 14. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government . . . [s]ince decisions in these matters may implicate our relations with foreign powers"). This is not an argument grounded in history and tradition at the time the Second Amendment was adopted. In addition, on the merits, the Supreme Court's decisions in *Verdugo-Urquidez* and *Bruen* suggest that such deference to the

14

political branches is not owed in Mr. Benito's circumstance, as he presents a constitutional challenge to a criminal prosecution. The argument is unpersuasive.

Given the above, the government has not met its heavy burden. It has not demonstrated, at least in Mr. Benito's case, that immigrant disarmament is a principle consistent with American history and tradition at the founding.

## IV. Conclusion

The motion to dismiss is granted. The Clerk shall close the case.

**SO ORDERED**, this the 3rd day of July, 2024.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE